C.K. Lee, Esq., *to be admitted pro hac vice*
Email: cklee@leelitigation.com
**LEE LITIGATION GROUP, PLLC**
148 W. 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

Ted. K. Lippincott (SBN: 283704)
Email:tlippincott@levineblit.com
**LEVINE & BLIT LLP**
6300 Wilshire Blvd, Ste 1870
Los Angeles, CA 90048
Tel.: (310) 281-0100
Fax: (310) 281-0140

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IAN GABRIEL and SHARON MANIER, on behalf of themselves and others similarly situated,<br><br>                                        Plaintiffs,<br><br>v.<br><br>GENERAL MILLS, INC., GENERAL MILLS SALES, INC., and GENERAL MILLS OPERATIONS, LLC,<br><br>                                        Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs IAN GABRIEL and SHARON MANIER, individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, pursuant

to this Class Action Complaint against GENERAL MILLS, INC., GENERAL MILLS SALES, INC., and GENERAL MILLS OPERATIONS, LLC, allege the following:

## NATURE OF THE ACTION

1.     This is a consumer protection action arising out of deceptive and otherwise improper business practices that GENERAL MILLS, INC., GENERAL MILLS SALES, INC., and GENERAL MILLS OPERATIONS, LLC ("Defendants"), engage in with respect to the packaging of three of their breakfast cereal products. These are

(1) 11.7 oz. Golden Grahams cereal ("Small Golden Grahams Product");

(2) 10.8 oz. Honey Nut Cheerios cereal ("Small Honey Nut Cheerios Product"); and (3) 15.4 oz Honey Nut Cheerios cereal ("Large Honey Nut Cheerios Product") (individually, a "Product," collectively, the "Products").

2.     The Products, which are sold extensively throughout California and the United States, are uniformly sold in non-transparent cardboard boxes that contain excessive empty space. This empty space serves no legitimate purpose and is designed to mislead consumers into believing that the Products contain more cereal than they really do.

3.     The foregoing is proven by comparing the Products to other boxes containing the very same cereal that formerly were, or still are, sold by Defendants.

4.     For example, Defendants formerly managed to fit entire 13.0 oz of Golden Grahams cereal in a box that was only 10.75 inches tall (the "Comparison Small-Plus Golden Grahams Box"). By contrast, the Small Golden Grahams Product purchased by Plaintiff GABRIEL is 11.25 inches tall but contains only 11.7 oz of cereal, leaving significantly greater empty space.  That this additional empty space is not functionally necessary is proven by the fact that an earlier iteration of the same product could make do without it.

5.      The cereal in the Small Golden Grahams Product only fills approximately 7.75 inches of the box, leaving about 3.5 vertical inches of air.[1] The cereal occupies about 69%[2] of the box; air occupies the other 31% of the box, leaving 31% slack-fill.[3] By contrast, in the cereal in the Comparison Small-Plus Golden Grahams Box, reaches to approximately 8.61 inches of the box, leaving approximately 2.14 inches of slack-fill.[4] The cereal occupies about 80%[5] of the box; air occupies the other 20% of the box, leaving only 20% slack-fill.[6]  The contrast is illustrated in the image below:

---

[1] 11.25 inches of vertical capacity – 7.75 inches of cereal = 3.5 inches of slack-fill.

[2] $\dfrac{7.75 \text{ inches of cereal}}{11.25 \text{ inches of vertical capacity}}$ = Approximately 69% of the Product filled with cereal.

[3] 100% – Approximately 69% of the Product filled with cereal = Approximately 31% slack-fill is in the Small Golden Grahams Product Box.

[4] 11.25 inches of vertical capacity – 8.5 inches of cereal = 2.75 inches of slack-fill.

[5] $\dfrac{8.561 \text{ inches of cereal}}{10.75 \text{ inches of vertical capacity}}$ = Approximately 80% of the Comparison Small-Plus Golden Grahams Product box is filled with cereal.

[6] 100% – Approximately 80% of the Product filled with cereal = Approximately 20% slack-fill is in the Comparison Small-Plus Golden Grahams Product box.



6.     Likewise, the Small Honey Nut Cheerios Product purchased by PLAINTIFF MANIER contains 10.8 oz. of cereal, yet Defendants manage to package 12.25 oz. of the same cereal in a box with virtually identical dimensions ("Comparison Small-Plus Honey Nut Cheerios Box"), proving once again that that at least some of the empty space in the Product is not functionally necessary and serves only to deceive consumers about how much cereal they are receiving.

7.     The cereal Small Honey Nut Cheerios Product Box only fills approximately 7.875 inches of the box, leaving about 3.375 vertical inches of air.[7] The cereal occupies about 70%[8] of the box; air occupies the other 30% of the box, leaving 30% slack-fill.[9] By contrast, the cereal in the Comparison Small-Plus Honey Nut Cheerios Box occupies approximately 8.5 inches of the box, leaving approximately 2.75 inches of slack-fill.[10] The cereal occupies about 75%[11] of the box; air occupies the other 25% of the box, leaving only 25% slack-fill.[12] The contrast is illustrated in the image below:

---

[7] 11.25 inches of vertical capacity – 7.875 inches of cereal = 3.375 inches of slack-fill.

[8] $\dfrac{7.875 \text{ inches of cereal}}{11.25 \text{ inches of vertical capacity}}$ = Approximately 70% of the Product filled with cereal.

[9] 100% – Approximately 70% of the Product filled with cereal = Approximately 30% slack-fill is in the Small Product Box.

[10] 11.25 inches of vertical capacity – 8.5 inches of cereal = 2.75 inches of slack-fill.

[11] $\dfrac{8.5 \text{ inches of cereal}}{11.25 \text{ inches of vertical capacity}}$ = Approximately 75% of the Comparison Small-Plus Honey Nut Cheerios Box is filled with cereal.

[12] 100% – Approximately 75% of the Product filled with cereal = Approximately 25% slack-fill is in the Comparison Small-Plus Honey Nut Cheerios Box.



8.      Defendants manufacture, market, and sell the Products with non-functional slack-fill in violation of the Federal Food Drug & Cosmetic Act ("FDCA") Section 403(d) (21 U.S.C. 343(d)), implemented through the Code of Federal Regulations Title 21 part 100, *et. seq.*, as well as the laws of California, the other 49 states, and the District of Columbia. which impose requirements identical to federal law. Defendants' boxes are made, formed, or filled as to be misleading.

9.      Upon information and belief, Defendants have sold and continue to sell the Products with non-functional slack-fill throughout the Class Period (as defined below).

10.     The size of the cardboard boxes in comparison to the volume of cereal contained therein makes it appear as though Plaintiffs and Class members are buying more food than they are actually being sold. Plaintiffs and Class members were denied the benefit of their bargain because they paid for full boxes of the Products but received boxes that were substantially filled with air.

11.     The slack-fill (air or empty space) in the Product boxes is far in excess of what can be found, or used to be found, in other similarly sized boxes containing the same cereal sold by the same manufacturer.  Slack-fill is air or filler material within a packaged product. Non-functional slack-fill is slack-fill that serves no legitimate purpose and only misleads consumers about the quantity of food they are purchasing. When consumers purchase a package of Defendants' Products, they are getting less cereal than they bargained for. They are effectively tricked into paying for air, because each Product box contains a large amount of non-functional slack-fill.

12.     All Product boxes are standardized to be underfilled with cereal (i.e., overfilled with air). For each type of Product and box size, Class members' Products were filled to the same common standards.

13.     Plaintiffs bring this action on behalf of themselves and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Products for consumption and not for resale.

14.     During the Class Period, Defendants manufactured, marketed, and sold the Products throughout the State of California and the United States. Defendants purposefully sold the Product with non-functional slack-fill as part of a systematic practice.

15.     The only reason Defendants procure and use oversized and under-filled boxes is to mislead consumers about the quantity of cereal within each Product.

16.     Plaintiffs and Class members viewed Defendants' misleading Product packaging and reasonably relied on the Product packaging's implicit representations of volume when purchasing the Products. Plaintiffs and Class members were thereby deceived into purchasing Products they would not have purchased at the given price had they known the truth about how much food they were receiving.  Accordingly, they were financially injured when they received less than they had bargained for. Through these unfair and deceptive practices, Defendants have collected millions of dollars from the sale of their Products that they would not have otherwise earned. Plaintiffs bring this action to stop Defendants' deceptive practices.

17.     Plaintiffs do not seek to enforce any state law whose requirements go beyond those of federal laws or regulations.

## **JURISDICTION AND VENUE**

18.     Jurisdiction in this Court is proper. Defendants have systematic and continuous contacts within the state of California. The Court has personal jurisdiction over the Defendants because their Products are advertised, marketed, distributed, and sold throughout the state of California; Defendants engaged in the wrongdoing alleged in this Complaint throughout California; Defendants are authorized to do business in California, and Defendants have sufficient minimum contacts with California and/or otherwise have intentionally availed themselves of the markets in California, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play

and substantial justice. Moreover, Defendants are engaged in substantial and not isolated activity within California, having sold millions of units of the Products in this State.

19.     Plaintiffs' claims arise under the laws of the State of California, are not preempted by federal law, do not challenge conduct within any federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

20.     Venue is proper in this district pursuant to 28 U.S.C § 1391(a) and (b) because a substantial part of the events giving rise to both Plaintiffs' claims occurred in this District, and Defendants are subject to personal jurisdiction in this District. Moreover, Defendants distribute, advertise, and sell the Products, which are the subject of the present Complaint, in this District.

## **PARTIES**

### *Plaintiff GABRIEL*

21.     Plaintiff GABRIEL is, and at all relevant times hereto has been, a citizen of the state of California and a resident of Los Angeles County. On September 3, 2018, Plaintiff GABRIEL purchased the Small Golden Grahams Product for personal consumption at a Ralphs Supermarket located at 3410 W. 3rd St., Los Angeles, CA 90020 in Los Angeles County.

22.     Plaintiff GABRIEL purchased the Product for $2.99 and was financially injured as a result of Defendants' deceptive conduct when he did not receive the quantity of cereal that he paid for and was promised by Defendants. Plaintiff GABRIEL paid to receive a box of cereal that was functionally full (i.e., containing only cereal and a minimal amount of underlined functional slack-fill), but the box Plaintiff GABRIEL received contained approximately 31% slack-fill.

23.     By contrast, only 20% of the space in the Comparison Small-Plus Golden Grahams box consists of slack-fill. This slack-fill may be partially non-functional. But even if it is entirely functional, the Comparison Small-Plus Golden Grahams Box

demonstrates that no more than 20% of the space in a small box of Golden Grahams need consist of slack-fill. It follows that the Small Golden Grams Product should have been at least 80% full, and therefore that at least 11% of the space in that Product consists of unlawful, non-functional slack-fill.

24.     As the result of Defendants' deceptive conduct, Plaintiff GABRIEL was injured when he paid full price for the Product but did not receive the full amount of cereal he had bargained for. He paid $2.99 for the Product on the reasonable assumption that box was filled to functional capacity. He would not have paid this sum had he known that the box contained unnecessary slack-fill or had the box been properly proportioned to its actual contents. Defendants promised Plaintiff GABRIEL a full box of cereal for $2.99, but it only delivered a partially full box, depriving him of the benefit of his bargain.

25.     Plaintiff GABRIEL paid $2.99 for a box that was 69% full but that he could reasonably expect would be at least 80% full. Thus, he received only 86.25% of what he bargained for (69/80). Correlatively, he was unlawfully deprived of 13.75% of what he bargained for. 13.75% of the purchase price is $0.41, which is therefore the amount of his injury as a result of Defendants' deceptive practice. This sum essentially paid for air masquerading as cereal.

26.     Absent court-mandated corrective changes to the packaging, Plaintiff GABRIEL will be unable to rely on its truthfulness if he encounters the Products in the future. Since he cannot see inside the Product boxes, he will not know whether or not Defendants' have eliminated the non-functional that is presently inside them.  He would be willing to purchase the Products again only if assured of this.

### Plaintiff MANIER

27.     Plaintiff MANIER is, and at all relevant times hereto has been, a citizen of the state of California and a resident of Riverside County, California. On August 11, 2018, Plaintiff MANIER purchased a box of the Small Honey Nut Cheerios Product for

personal consumption. Plaintiff MANIER purchased the Product at a Food4Less located at 3900 Chicago Ave., Riverside, CA 92507 in Riverside County.

28.    Plaintiff MANIER purchased the Product for $2.99 and was financially injured as a result of Defendants' deceptive conduct when she did not receive the quantity of cereal that she paid for and was promised by Defendants. Plaintiff MANIER paid to receive a box of cereal that was functionally full (i.e., containing only cereal and a minimal amount of underlined functional slack-fill), but the box Plaintiff MANIER received contained approximately 30% slack-fill.

29.    By contrast, only 25% of the space in Comparison Small-Plus Honey Nut Cheerios Product box consists of slack-fill. This slack-fill may be partially non-functional. But even if it is entirely functional, the Comparison Small-Plus Honey Nut Cheerios Product box demonstrates that no more than 25% of the space in a small box of Honey Nut Cheerios need consist of slack-fill. It follows that the Small Honey Nut Cheerios Product should have been at least 75% full, and that at least 5% of the space in that Product consists of unlawful, non-functional slack-fill.

30.    As the result of Defendants' deceptive conduct, Plaintiff MANIER was injured when She paid full price for the Product but did not receive the full amount of cereal She had bargained for. She paid $2.99 for the Product on the reasonable assumption that box was filled to functional capacity. He would not have paid this sum had she known that the box contained unnecessary slack-fill or had the box been properly proportioned to its actual contents. Defendants promised Plaintiff MANIER a full box of cereal for $2.99, but it only delivered a partially full box, depriving her of the benefit of her bargain.

31.    Plaintiff MANIER paid $2.99 for a box that was 70% full but that she could reasonably expected would be at least 75% full. Thus, she received only 93% of what she bargained for (70/75). Correlatively, she was unlawfully deprived of 7% of what she bargained for. 7% of the purchase price is $0.21, which is therefore the amount of her

injury as a result of Defendants' deceptive practice, since this sum essentially paid for air that she was led to believe was cereal.

32.     Absent court-mandated corrective changes to the packaging, Plaintiff MANIER will be unable to rely on its truthfulness if she encounters the Products in the future. Since she cannot see inside the Product boxes, she will not know whether or not Defendants' have eliminated the non-functional that is presently inside them.  She would be willing to purchase the Products again only if assured of this.

***Defendants***

33.     Defendants produce and market food products in the United States and throughout the world. Defendants sell food products under the "Cheerios", "Golden Grahams", and other cereal brand names throughout California, as well as the rest of the United States.

34.     Defendant General Mills, Inc. is a Delaware corporation with its principal place of business in Minneapolis, Minnesota, and is registered to do business in California. General Mills, Inc. controls Defendants' operations through subsidiary corporations.

35.     Defendant General Mills Sales, Inc. is a Delaware Corporation with its principal place of business in Minneapolis, Minnesota. General Mills Sales, Inc. is a subsidiary of Defendant General Mills, Inc., and is registered to do business in California. Defendant General Mills Sales, Inc. registers food and packaging with regulatory agencies such as the FDA and USDA.

36.     General Mills Operations, LLC is a Delaware Limited Liability Corporation with its principal place of business in Minneapolis, Minnesota. General Mills Operations, LLC is a subsidiary of Defendant General Mills, Inc., and is registered to do business in California. General Mills Operations, LLC controls the day-to-day operations of Defendants.

37.     The packaging and advertising for the Products, relied upon by Plaintiffs, were prepared and/or approved by Defendants and their agents, and were disseminated by Defendants and their agents through advertising containing the misrepresentations alleged herein. Such packaging and advertising were designed to encourage consumers to purchase the Products and misled reasonable consumers, including Plaintiffs and the Class, into purchasing the Product. Defendants own, market, and distribute the Products, and create and/or authorize the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and advertising for the Products.

38.     The address for service of process for all three Defendants is National Registered Agents, Inc., 818 West Seventh Street, Suite 930, Los Angeles, CA 90017.

## FACTUAL ALLEGATIONS

### The Products Contain Non-Functional Slack-Fill

39.     The Products are packaged in various sizes with various fill levels. The Products are mass-produced, such that each box is filled identically to other boxes of the same size and flavor. Defendants substantially underfill the Products.

40.     Plaintiffs' Products were underfilled, as demonstrated by comparing them to similarly sized boxes of the same cereals produced by Defendants. As discussed in ¶¶ 4-7, the Small Golden Grahams Product and Small Honey Nut Cheerios Product do not require the level of slack-fill found therein. The comparison boxes demonstrate that it is possible to fill more cereal in boxes of equal or smaller size.  Thus, the slack-fill found in these Products is non-functional.  It functions only to deceive consumers regarding the quantity of food they are purchasing.

41.     The 15.4 oz. Large Honey Nut Cheerios Product also contains substantial non-functional slack-fill.  The plastic bag enclosing the cereal in this Product is far narrower than is necessary, leaving about 0.75 inches of extra horizontal space:

1
2
3
4
5
6
7
8
9
10
11



**Large Honey Nut Cheerios Product — 15.4 oz.**

12   42.   That this horizontal slack-fill is not functionally necessary is proven by
13   Defendants' 17 oz. Honey Nut Cheerios box ("Comparison Large-Plus Honey Nut
14   Cheerios Box"). The dimensions of these boxes are virtually identical. The dimensions
15   of the Product are 2.5 in. x 7.625 in. x 11.9375 in. Those of the Comparison Large-Plus
16   Honey Nut Cheerios Box are 2.625 x 7.625 in. x 11.9375 in. Yet the comparison box
17   contains more cereal and no horizontal slack-fill:

18
19
20
21
22



**Comparison Large-Plus Honey Nut Cheerios Box — 17 oz.**

23
24
25
26
27
28

43.    Both the Large Honey Nut Cheerios Product and the Comparison Large-Plus Honey Nut Cheerios Box contain about 2.75 vertical inches of air. The Large Honey Nut Cheerios Product has 9 vertical inches of cereal[13] and the Comparison Large-Plus Honey Nut Cheerios Box has about 9.2 inches of cereal.[14] However, the cereal in the Comparison Large-Plus Honey Nut Cheerios Box occupies the entire 7.625 inch width of the box, whereas the cereal in the Large Honey Nut Cheerios Product leaves 0.75 inches of horizontal slack-fill.  The result is that the cereal in the Product occupies only about 69%.[15] Air occupies the other 31% of the box, leaving 31% slack-fill.[16] By contrast, the cereal in the Comparison Large-Plus Honey Nut Cheerios Box occupies 77% of the space in the box,[17] leaving only 23% slack-fill. The difference is illustrated by the images below:

---

[13] 11.75 inches of vertical capacity − 2.75 inches of slack-fill = 9 vertical inches of cereal.

[14] 11.9375 inches of vertical capacity − 2.75 inches of slack-fill = 9.1875 vertical inches of cereal.

[15] $\frac{9\text{ vertical inches of cereal}}{11.75\text{ inches of vertical capacity}} * \frac{6.875\text{ horizontal inches of cereal}}{7.625\text{ inches of horizontal capacity}}$ = Approximately 69% of the Large Honey Nut Cheerios Product box is filled with cereal.

[16] 100% − Approximately 69% of the Large Honey Nut Cheerios Product box filled with cereal = Approximately 31% slack-fill is in the Large Honey Nut Cheerios Product Box.

[17] $\frac{9.2\text{ inches of cereal}}{11.9375\text{ inches of vertical capacity}}$ = Approximately 77% of the Product filled with cereal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Large Honey Nut Cheerios Product — 15.4 oz.**
**2.5 in. x 7.625 in. x 11.9375 in.**

**Comparison Large-Plus Honey Nut Cheerios Box — 17 oz.**
**2.625 in. x 7.625 in. x 11.9375**

**Approximate Height of Cereal**

**Air that is Non-Functional Slack-Fill**

CLASS ACTION COMPLAINT

44.     Even if the <u>vertical</u> slack-fill in both boxes is entirely functional, the absence of any <u>horizonal</u> slack-fill in the Comparison Large-Plus Honey Nut Cheerios Box demonstrates that the horizontal slack-fill in the Large Honey Nut Cheerios Product is unnecessary.  Its only function is to deceive consumers about how much food they are really purchasing.  At least 8% of the space in the Large Honey Nut Cheerios Product consists of non-functional slack-fill.

## Identical Federal and State Law Prohibit Misbranded Foods with Non-Functional Slack-Fill

45.     Under § 403(d) of the FDCA (21 U.S.C. § 343(d)), a food shall be deemed to be misbranded "[i]f its container is so made, formed, or filled as to be misleading." The FDA has implemented § 403(d) through 21 C.F.R. § 100.100, which states:

> In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.
>
> (a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:
>
> (1) Protection of the contents of the package;
>
> (2) The requirements of the machines used for enclosing the contents in such package;
>
> (3) Unavoidable product settling during shipping and handling;
>
> (4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;
>
> (5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or
>
> (6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required

food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

46. The food labeling laws and regulations of California impose requirements which mirror federal law.

47. California's Business & Professions Code § 12606.2, California's Fair Packaging and Labeling Act ("CFPLA"), provides that "No food containers shall be made, formed, or filled as to be misleading." CA B&P Code § 12606.2(b). Further, "[a] container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill." CA B&P Code § 12606.2(c). The CFPLA is to be interpreted "consistent with the comments by the United States Food and Drug Administration on the regulations contained in Section 100.100 of Title 21 of the Code of Federal Regulations, interpreting § 403(d) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 343(d)), as those comments are reported on pages 64123 to 64137, inclusive, of Volume 58 of the Federal Register." CA B&P Code § 12606.2(e).

48. California's Sherman Food, Drug, and Cosmetic Law (the "Sherman Law"), California Health & Safety Code § 109875 *et seq*., prohibits misleading containers: "Any food is misbranded if its container is so made, formed, or filled as to be misleading." Cal. Health & Safety Code § 110690. This is essentially identical to the text of the FDCA, which provides that "A food shall be deemed to be misbranded... [i]f its container is so made, formed, or filled as to be misleading." 21 U.S.C. Sec. 343(d). The Sherman Law establishes as California state law the same standards as the Federal Food, Drug, and Cosmetic Act:

Definitions and standards of identity, quality, and fill of container, and any amendments to the definitions and standards, adopted pursuant to the [FDCA] in effect on the effective date of this part, or adopted on or after that date, are the definitions and standards of identity, quality, and fill of container in this state.

Cal. Health & Safety Code § 110505.

49.     The Sherman Law explicitly incorporates standards adopted under FDA regulations, including FDCA and FPLA regulations:

> All regulations and their amendments pertaining to foods, drugs, devices, and cosmetics that are in effect on the effective date of this part, or that are adopted on or after that date, pursuant to the Fair Packaging and Labeling Act (80 Stat. 1296; 15 U.S.C. Sec. 1451 et seq.) shall be the regulations of this state.

Cal. Health & Safety Code § 110380.

50.     The Sherman Law explicitly proscribes non-functional slack-fill:

> No container shall be made, formed, or filled as to be misleading. A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack fill. Slack fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack fill is the empty space in a package that is filled to substantially less than its capacity for reasons other than [enumerated exceptions].

Cal. Health & Safety Code § 110375(b).

**The Safe-Harbor Provisions of 21 C.F.R. § 100.100 Do Not Justify the Slack-Fill in Defendants' Products**

51.     The FDA has defined non-functional slack-fill as any slack-fill in excess of that required to achieve the functional purposes listed in 21 C.F.R. § 100.100(a):

> FDA advises that the exceptions to the definition of "nonfunctional slack-fill" in § 100.100(a) apply to that portion of the slack-fill within a container that is necessary for, or results from, a specific function or practice, e.g., the need to protect a product. <u>Slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill.</u> Thus, the exceptions in § 100.100(a) provide only for that amount of slack-fill that is necessary to accomplish a specific function. FDA advises that <u>these exceptions do not exempt broad categories of food</u>, such as gift products and convenience foods, from the requirements of section 403(d) of the act. For example, § 100.100(a)(2) recognizes that some slack-fill may be necessary to accommodate requirements of the machines used to enclose a product in its container and is therefore functional slack-fill. However, § 100.100(a)(2) <u>does not exempt all levels of slack-fill in all mechanically packaged products from the definition of nonfunctional slack-fill</u>.

58 FR 64123, 64126 (emphasis added).

52.    Thus, the possibility that some portion of the slack-fill in the Products may be justified as functional based on the exemptions in §100.100(a) does not justify slack-fill that is in excess of that required to serve these enumerated purposes—protecting contents, accommodating the machines that enclose the contents, accommodating settling, etc. Such slack-fill serves no purpose other than to mislead consumers about the quantity of food they are actually purchasing.

53.    The fact that Defendants' Products contain slack-fill in excess of what is permitted under § 100.100 is proven by the comparison boxes, which are similarly sized or smaller yet contain more cereal, and hence less slack-fill, despite being under the same constraints regarding the need to protect package contents, accommodate machines, and settling.

54.    These comparisons are between the same cereal in the same or virtually the same packaging that is enclosed in the same way by the same kind of technology. And yet Defendants manage to package the comparison boxes in a way that leaves consumers with a more accurate sense of how much food they are really purchasing. Thus, whatever real constraints might justify the slack-fill in the comparison cereal boxes cannot explain the excess, non-functional slack-fill in the Products. This logic applies for every safe-harbor provision of 21 C.F.R. § 100.100(a)(1–6), as follows:

### (1) Protection of the contents of the package

55.    Defendants package identical cereal in smaller or virtually identical cardboard boxes with far less slack-fill than is found in the Products. Any slack-fill in the Products that exceeds the amount of slack-fill in the comparison boxes therefore does not qualify for this safe harbor, since the comparison boxes demonstrate that this level of slack-fill is not required in order to protect the contents of the packages.

**(2) The requirements of the machines used for enclosing the contents in such package**

56.    Defendants package identical cereal in smaller or virtually identical cardboard boxes with far less slack-fill than is in the Products. Any slack-fill in the Products that exceeds the amount of slack-fill in those other boxes therefore does not qualify for this safe harbor. The comparison boxes demonstrate that the machines used to enclose and seal the Products do not require the level of slack-fill that is actually found in them.

57.    Moreover, this safe harbor is obviously inapplicable to the Large Honey Nut Cheerios Product, since sealing a box at the top is not facilitated by the presence of horizontal slack-fill.

**(3) Unavoidable product settling during shipping and handling**

58.    Defendants package identical cereal in smaller or virtually identical cardboard boxes with far less slack-fill than is in the Products. The cereal in the comparison boxes undergoes the same minimal amount of settling, but any settling in those boxes does not create the level of slack-fill found in the Products. Any slack-fill in the Products in excess of that in the comparison boxes therefore does not qualify for this safe harbor. Such slack-fill is demonstrably not "unavoidable" because Defendants in fact manage to avoid it in the comparison boxes.

59.    Moreover, this safe harbor is obviously inapplicable to the Large Honey Nut Cheerios Product, since settling cannot explain horizontal slack fill generated by the width of the inner bag.

**(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers**

60.     The cereal in the comparison boxes are intended to be prepared and consumed in the same manner as the cereal in the Products. Any slack-fill in the Products that exceeds that in the comparison boxes therefore does not qualify for this safe harbor. There is no special function performed by Product boxes that is not performed by the comparison boxes.

**(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages**

61.     This safe harbor does not apply to the Products because the Product boxes are not reusable, are not part of the food presentation, and have no significant value other than to contain the food.

**(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices)**

62.     Nothing prevents Defendants from reducing the size of the Products' boxes or from more fully filling them with cereal, since this is in fact achieved in the comparison boxes.

**Defendants' Misleading Packaging Practices Would Deceive, Be Relied Upon By, and Be Material to a Reasonable Consumer**

63.   Defendants' misleading packaging practices deceived, were material to, and were relied upon by, Plaintiffs and the Class. These practices would also deceive, be material to, and be relied upon by, a reasonable consumer, since reasonable consumers attach considerable importance to the quantity of a product they believe they are receiving.

64.   Plaintiffs and the Class did not know, and had no reason to know, that the size of the Product packaging misrepresented the quantity of cereal contained therein. Since other cereal boxes are more fully filled, it was reasonable for them to believe that the Products would be more fully filled. Had Plaintiffs and Class members known Defendants' Products contained non-functional slack-fill, they would not have bought the Products for the amount they paid.

65.   The net weight and serving size disclosures on the package are fundamentally not the type of disclosure that could cure a false impression of quantity engendered by excessive slack-fill in packaged food. Even if Defendants' net weight disclosures were accurate, such would not eliminate this basic deception caused by Defendants' misleading packaging.  The FDA has confirmed this in unequivocal terms:

> FDA disagrees with the comments that stated that net weight statements protect against misleading fill. <u>FDA finds that the presence of an accurate net weight statement does not eliminate the misbranding that occurs when a container is made, formed, or filled so as to be misleading.</u>

58 FR 64123, 64128 (emphasis added).

66.   This FDA determination reflections congressional intent, which was to provided consumers with additional protections beyond those already provided by prohibitions against deceptive labeling.

> Section 403(e) of the act requires packaged food to bear a label containing an accurate statement of the quantity of contents. This requirement is separate and in addition to section 403(d) of the act. To rule that an accurate net weight statement protects against misleading fill would render the prohibition against misleading fill in section 403(d) of the act redundant. In fact, Congress stated (S. Rept. No. 493, 73d Cong., 2d sess. 9 (1934)) in arriving at <u>section 403(d) of the act that that section is "intended to reach deceptive methods of filling where the package is only partly filled and, despite the declaration of quantity of contents on the label, creates the impression that it contains more food than it does."</u> Thus, Congress clearly intended that failure to comply with either section would render a food to be misbranded.

58 FR 64123, 64128-64129 (emphasis added).

67.     Congress recognized that packaging is in and of itself a form of advertising, over and above whatever written statements may be printed on it:

> Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: "<u>Packages have replaced the salesman. Therefore, it is urgently required that the information set forth on these packages be sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products</u>" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container. Further, Congress stated (S. Rept. 361, supra at 9) that "<u>Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label.</u>"

58 Fed. Reg. 64123-01, 64131 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100) (emphasis added).

68.     Congress recognized that the size of a package is in and of itself a kind of sales pitch, even if not made with words or numbers. Thus, consumers can reasonably rely on packaging size as a representation of quantity regardless of whatever is printed on the label. And manufacturers can be held responsible for non-functional slack-fill regardless of whatever else they say. The presence of true label statements on the Products' packaging regarding weight and number of servings, if any, would not and could not mitigate the false implicit statement of quantity made by the package size.

69.     California law incorporates the FDCA and the FDA commentary thereon in pages 64123 to 64137, inclusive, of Volume 58 of the Federal Register. *See* ¶ 47, *supra*. Since the FDA commentary endorses Congress's determination that "[p]ackages only partly filled create a false impression as to the quantity of food which they contain," *see* ¶ 67, it can be presumed <u>as a matter of law</u> that Defendants' packaging practices would deceive a reasonable consumer. Additionally, since the incorporated FDA commentary also endorses Congress's determination that accurate quantity disclosures do not exculpate non-functional slack-fill, <u>as a matter of law</u>, Defendants' quantity disclosures have no legal significance.

70.     Defendants might argue that Plaintiffs and the Class should not have relied on the packaging's size to infer its contents because they could have manipulated the packaging in order to acquire a sense of the slack-fill therein (i.e., shaking the package to hear the cereal rustling), but the FDA has stated that such manipulation cannot be reasonably expected of consumers:

> FDA advises that the entire container does not need to be transparent to allow consumers to fully view its contents, i.e., a transparent lid may be sufficient depending on the conformation of the package. On the other hand, FDA finds that <u>devices, such as a window at the bottom of a package, that require consumers to manipulate the package, e.g., turning it upside down and shaking it to redistribute the contents, do not allow consumers to fully view the contents of a container</u>. FDA finds that such devices do not adequately ensure that consumers will not be misled as to the amount of product in a package. Therefore, such foods remain subject to the requirements in § 100.100(a) that slack-fill in the container be functional slack-fill.

58 FR 64123, 64128 (emphasis added).

Here, the FDA was contemplating a scenario in which manipulating a package might permit an accurate visual estimate of its contents. This is clearly impossible in the case of Defendants' wholly non-transparent cardboard packaging, which can only provide audial or clues as to the Products' slack-fill. But the same basic principle applies: the possibility that manipulating a package might yield additional insight into its contents

does not exculpate non-functional slack-fill (just as accurate net weight disclosures do not).

71.     Even if consumers have come to expect significant slack-fill in boxed cereal products, this too would could not eliminate Defendants' deception. The FDA has stated that "although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional." 58 FR 64123, 64131.

## Plaintiffs Were Injured as a Result of Defendants' Misleading and Deceptive Conduct

72.     Defendants' Product packaging as alleged herein is deceptive and misleading and was designed to increase sales of the Products. Defendants' misrepresentations are part of its systematic Product packaging practices.

73.     Plaintiffs and Class members paid the full price of the Products and received less than what Defendants represented they would be getting owing to the non-functional slack-fill in the Products. In order for Plaintiffs and Class members to be made whole, Plaintiffs and Class members would have to receive money equivalent to the difference between what Defendants promised them and what they actually received. Thus, Plaintiffs and members of the Class have been injured in the amount of the percentage of the purchase price corresponding to the amount of non-functional slack-fill in the Products (as calculated above in ¶¶ 22-25, 28-31).

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Nationwide Class, defined as follows:

All persons or entities who made retail purchases of the Products during the applicable limitations period, and/or such subclasses as the Court may deem appropriate (the "Nationwide Class").[18]

75.     In the alternative, Plaintiffs bring this class action on behalf of a California Class, defined as follows:

All persons or entities who made retail purchases of the Products in California during the applicable limitations period, and/or such subclasses as the Court may deem appropriate (the "California Class").

76.     The proposed Classes exclude current and former officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, Defendants' legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

77.     *Numerosity.* The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through the appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Classes. Other Class members may be identified from records maintained by Defendants and may be

---

[18] Courts in this District have held that *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), does not speak to class action. *See Sotomayor v. Bank of Am., N.A.*, 377 F. Supp. 3d 1034, 1037 (C.D. Cal. 2019) ("Plaintiff asserts that *Bristol-Myers* applies to mass tort actions, not class actions. The Court agrees. Although the Ninth Circuit has not addressed this question, the weight of authority examining this issue has concluded that *Bristol-Myers* does not apply to class actions."); *Cabrera v. Bayer Healthcare, LLC*, No. LA CV17-08525 JAK (JPRx), 2019 U.S. Dist. LEXIS 42290, at *19 (C.D. Cal. Mar. 6, 2019)  ("The decisions concluding that *Bristol-Meyers* does not apply in the class action context are more persuasive. The significant distinctions between a class action and a mass tort action warrant this outcome. Each plaintiff in a mass tort action is a real party in interest, while the named plaintiffs in a putative class action are the only ones actually named, and represent similarly situated persons.")

notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this.

78.   *Typicality.* Plaintiffs' claims are typical of the claims of Class members, who are all similarly affected by Defendants' wrongful conduct.

79.   *Adequacy of Representation.* Plaintiffs will fairly and adequately protect the interests of Class members in that Plaintiffs have no interests antagonistic to theirs. Plaintiffs have retained experienced and competent counsel.

80.   *Superiority.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually seek redress for the wrongful conduct alleged herein. If class treatment of these claims were not available, Defendants would likely unfairly receive millions of dollars or more in improper charges.

81.   *Predominance.* Common questions of law and fact that exist as to all Class members predominate over any questions solely affecting individual Class members. Among questions of law  and fact common to the Classes are:

   i.   Whether Defendants advertised the Products to Plaintiffs and Class members with misleading packaging;

   ii.   Whether Defendants' actions constitute violations of 21 U.S.C. § 343(d);

   iii.   Whether Defendants' packaging of Products constituted an unfair, unlawful or fraudulent practice;

   iv.   Whether the packaging of the Products during the relevant statutory period constituted unlawful non-functional slack-fill;

   v.   Whether, and to what extent, injunctive relief should be imposed on Defendants to prevent such conduct in the future;

   vi.   Whether Class members have sustained damages as a result of Defendants' wrongful conduct;

vii.    Whether Defendants purposely chose non-transparent cardboard Product boxes so that Plaintiffs and Class members would not be able to see the amount of slack-fill contained in the Products;

viii.    The appropriate measure of damages and/or other relief; and

ix.    Whether Defendants should be enjoined from continuing their unlawful practices.

82.    The Classes are readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation. Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

84.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

85.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

86.     The prosecution of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interest of all Class members, although certain Class members are not parties to such actions.

87.     Defendants' conduct is generally applicable to the Classes as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

### COUNT I.

### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
#### (Cal. Civ. Code § 1750, *et seq*.)

**(brought individually and on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection laws of the other states and the District of Columbia to the extent California law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the California Class)**

88.     Plaintiffs MANIER and GABRIEL reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

89.     Plaintiffs MANIER and GABRIEL bring this claim individually and on behalf of the other members of the Nationwide or California Class against all Defendants for Defendants' violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*., including § 1761(d).

90.     Plaintiffs and Class members are consumers who purchased the Products for personal, family, or household purposes. Plaintiffs and Class members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d). They are

not sophisticated experts with independent knowledge of corporate branding, labeling and packaging practices.

91.    Products that Plaintiffs and Class members purchased from Defendants were "goods" within the meaning of Cal. Civ. Code § 1761(a).

92.    Defendants' actions, representations, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted, in the sale of goods to consumers.

93.    Defendants violated federal and California law because the Products contain non-functional slack-fill and because they are intentionally packaged to prevent the consumer from being able to fully see their contents.

94.    California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(5) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it misrepresents that the Products have quantities which they do not have.

95.    Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(9), because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent not to sell the goods as advertised.

96.    Plaintiffs and Class members are not sophisticated experts about the corporate branding, labeling, and packaging practices. Plaintiffs and members of the California Class acted reasonably when they purchased the Products based on the belief that the packaging was functionally full. The Products' net weight disclosures did not

inform them otherwise.  *See Escobar v. Just Born*, No. CV 17-01826, 2017 U.S. Dist. LEXIS 186573, at *25 (C.D. Cal. June 12, 2017) ("In the Court's view, a reasonable consumer is not necessarily aware of a product's weight or volume and how that weight or volume correlates to the product's size. In other words, the fact that the Products' packaging accurately indicated that a consumer would receive 141 grams or 5 ounces of candy does not, on its own, indicate to a reasonable consumer that the Products' box may not be full of candy and that, instead, 35.7% of the box is empty. Rather, a reasonable consumer may believe that 141 grams or five ounces of candy is equivalent to an amount approximately the size of the Products' box.").

97.    Plaintiffs and Class members suffered injuries caused by Defendants because (a) they were denied the benefit of their bargain due to Defendants' deceptive packaging with nonfunctional slack-fill; (b) the Products did not have the quantities as promised; and (c) they would not have purchased the Products on the same terms absent Defendants' illegal and misleading conduct as set forth herein, or if the true facts were known concerning Defendants' representations.

98.    On or about October 25, 2018, prior to filing this action, a CLRA notice letter was mailed to Defendants, which complies in all respects with California Civil Code § 1782(a). Plaintiffs sent Defendants, on behalf of themselves and the proposed Class, a letter via certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  A model compliant was attached to the letter in order to provide Defendants with additional details regarding their violations. A true and correct copy of Plaintiffs' CLRA letter is attached hereto as **EXHIBIT A**.

99.    Wherefore, Plaintiffs seek damages, restitution, and injunctive relief for these violations of the CLRA.

## COUNT II.

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
**(California Business & Professions Code § 17200, *et seq.*)**

**(brought individually and on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection laws of the other states and the District of Columbia to the extent California law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the California Class)**

100.   Plaintiffs MANIER and GABRIEL reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

101.   Plaintiffs MANIER and GABRIEL bring this claim individually and on behalf of the other members of the Nationwide or California Class against Defendants for Defendants' violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

102.   The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

103.   Defendants violated federal and California law because the Products contain non-functional slack-fill and because they are intentionally packaged to prevent the consumer from being able to fully see their contents.

104.   Defendants' business practices, described herein, violated the "unlawful" prong of the UCL by violating Section 403(r) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 343(d), the CFPLA, the Sherman Law, and other applicable laws as described herein.

105.   Since deception is not an element of violating the foregoing laws, Defendants violate these regulations irrespective of whether reasonable consumers would be deceived by the Product labels. Accordingly, Defendants also violate the "unlawful" prong of the UCL irrespective of any deception. *See Bruton v. Gerber Prods. Co.*, 703 F.

App'x 468, 471-72 (9th Cir. 2017) ("The UCL's unlawful prong 'borrows' predicate legal violations and treats them as independently actionable under the UCL… The best reading of California precedent is that the reasonable consumer test is a requirement under the UCL's unlawful prong only when it is an element of the predicate violation… The predicate violation here is of California's Sherman Law, *see* Cal. Health & Safety Code §§ 110760, 110765, which itself incorporates standards set by FDA regulations, *see id*. §§ 110100, 110670. These FDA regulations include no requirement that the public be likely to experience deception… We reverse the district court's grant of summary judgment to Gerber on Bruton's claims that the labels were unlawful in violation of the UCL.").

106.   Defendants' business practices, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits. Defendants' advertising is of no benefit to consumers. And its deceptive advertising offends the public policy advanced by the FDCA to ensure that "foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2)(A).

107.   Defendants violated the "fraudulent" prong of the UCL by misleading Plaintiffs and Class members to believe that (a) the Product boxes contained more cereal than they actually do, and (b) that such packaging practices were lawful, true, and not intended to deceive or mislead the consumers.

108.   Plaintiffs and Class members are not sophisticated experts about the corporate branding, labeling, and packaging practices of the Products. Plaintiffs and Class members acted reasonably when they purchased the Products based on their belief that Defendants' representations were true and lawful.

109.   Plaintiffs and Class members lost money or property as a result of Defendants' UCL violations because (a) they were denied the benefit of their bargain due to Defendants' misrepresentations and deceptive packaging with nonfunctional

slack-fill; (b) the Products did not have the quantities promised, and (c) they would not have purchased the Products on the same terms absent Defendants' illegal and misleading conduct as set forth herein, or if the true facts were known concerning Defendants' representations.

## COUNT III.

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### (California Business & Professions Code § 17500, *et seq.*)

**(brought individually and on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection laws of the other states and the District of Columbia to the extent California law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the California Class)**

110.   Plaintiffs MANIER and GABRIEL reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

111.   Plaintiffs MANIER and GABRIEL bring this claim individually and on behalf of the other members of the Nationwide or California Class against all Defendants for Defendants' violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

112.   Under the FAL, the State of California makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,… in any advertising device… or in any other manner or means whatever, including over the Internet, any statement, concerning… personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

113.   Defendants engaged in a scheme of offering misbranded Products for sale to Plaintiffs and Class members by packaging the Products with nonfunctional slack-fill and thus misrepresenting the quantity of food in the misbranded Products. Defendants'

advertisements and inducements were made in California and come within the definition of advertising as contained in Bus. & Prof. Code § 17500, *et seq.* in that the Products' packaging was intended as an inducement to purchase the Products. Defendants knew that their packaging was misleading.

114.  Defendants violated federal and California law because the Products contain non-functional slack-fill and because they are intentionally packaged to prevent the consumer from being able to fully see their contents.

115.  Defendants violated § 17500, *et seq.* misleading Plaintiffs and Class members by packaging the Products with non-functional slack-fill as described herein.

116.  Defendants knew or should have known, through the exercise of reasonable care that the Products were and continue to be misbranded, and that their representations about the quantity of the Products were untrue and misleading.

117.  Plaintiffs and Class members lost money as a result of Defendants' FAL violations because (a) they were denied the benefit of their bargain due to Defendants' misrepresentations and deceptive packaging with nonfunctional slack-fill; (b) the Products did not have the characteristics, benefits, or quantities promised; and (c) they would not have purchased the Products on the same terms absent Defendants' illegal and misleading conduct as set forth herein, or if the true facts were known concerning Defendants' slack-fill.

## COUNT IV.

## COMMON LAW FRAUD

**(brought individually and on behalf of the Nationwide Class under California law, in conjunction with the substantively similar common law fraud laws of the other states and the District of Columbia to the extent California common law fraud is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the California Class)**

118.  Plaintiffs MANIER and GABRIEL reallege and incorporate herein by

reference the allegations contained in all preceding paragraphs, and further allege as follows:

119.   Plaintiffs MANIER and GABRIEL bring this claim individually and on behalf of the other members of the Nationwide or California Class against Defendants for Defendants' common-law fraud.

120.   Through their Products' packaging, Defendants intentionally made materially false and misleading representations regarding the quantity of cereal that purchasers were actually receiving.

121.   Plaintiffs and Class members were induced by, and relied upon, Defendants' false and misleading representations and did not know the truth about the Products at the time they purchased them.

122.   Defendants knew of their false and misleading representations and knew that these would be relied upon by Class members. Defendants nevertheless continued to promote and encourage customers to purchase the Products in a misleading and deceptive manner, intending for Plaintiffs and Class members to rely on their misrepresentations.

123.   Had Plaintiffs and Class members known the actual amount of cereal they were receiving, they would not have purchased the Products.

124.   Plaintiffs and Class members have been injured as a result of Defendants' fraudulent conduct.

125.   Defendants are liable to Plaintiffs and Class members for damages sustained as a result of Defendants' fraud. In order for Plaintiffs and Class members to be made whole, they need to receive a refund consisting of the percentage of the purchase price corresponding to the non-functional slack-fill in the Products.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

(A)   For an Order certifying the Nationwide Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Nationwide Class and Plaintiffs' attorneys as Class Counsel to represent members of the Nationwide Class;

(B)   In the alternative, for an Order certifying the California Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the California Class and Plaintiffs' attorneys as Class Counsel to represent members of the California Class;

(C)   For an Order declaring the Defendants' conduct violates the statutes referenced herein;

(D)   For an Order finding in favor of Plaintiffs and Class members;

(E)   For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(F)   For prejudgment interest on all amounts awarded;

(G)   For an Order of restitution and all other forms of equitable monetary relief;

(H)   For injunctive relief to repackage the Products without non-functional slack-fill as pleaded or as the Court may deem proper;

(I)   For an Order awarding Plaintiffs and Class members their reasonable attorneys' fees and expenses and costs of suit; and

(J)   For such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable.

DATED: September 26, 2019

Respectfully submitted,

By: */s/ C.K. Lee*
      C.K. Lee, Esq.,

      */s/ Ted K. Lippincott*
      Ted. K. Lippincott, Esq.

*Attorneys for Plaintiffs and the Class*

CLASS ACTION COMPLAINT